201 P.3d 381 (2009)
William SYLVESTER and Betty Sylvester, Respondents,
v.
PIERCE COUNTY, a Washington municipal Corporation; Defendant,
Grace Group, Inc., a Washington corporation; Edward C. Becker, III; and Theodore R. Collins, Jr., and Michelle E. Collins, husband and wife, Appellants.
No. 37282-7-II.
Court of Appeals of Washington, Division 2.
February 10, 2009.
*383 William Theodore Lynn, Attorney at Law, Margaret Yvonne Archer, Attorney at Law, Tacoma, WA, for Appellants.
Steven Leonard Larson, Attorney at Law, Tacoma, WA, for Respondents.
HOUGHTON, J.
¶ 1 Edward Becker and Theodore and Michelle Collins appeal the superior court's reversal of the Pierce County hearing examiner's decision, granting them a reasonable use exception and allowing them to build single family residences on their property. Becker and the Collinses argue that they are entitled to a reasonable use exception because the lots were vested by March 1, 2005, as required by Pierce County Code (PCC) 18E.20.050(2)(a), and there is no evidence that they divided the lots and created their own hardship. Because the superior court correctly found that Becker's and the Collinses' lots did not vest by March 1, 2005, we affirm.[1]

FACTS
¶ 2 Ethel and William Hunter purchased 10 contiguous acres of land in rural Pierce County (County). The land comprised two parcels to which the County assessor-treasurer assigned individual tax parcel numbers.
¶ 3 After the Hunters died, the Hunter heirs decided to sell the property; Becker and the Collinses expressed interest in purchasing the property and requested a survey. The survey showed the two tax parcels as seven lots, instead of two, as it had been when the Hunters owned the property. On May 31, John Palmer, the personal representative of the Hunter Estate, sold four of the seven new parcels to Becker, two of the new parcels to Eduardo and Donna Renee Quiles, one of the parcels to the Collinses, and the seventh new parcel to Becker.[2] On July 8, Becker and the Collinses recorded the survey with the County auditor.
¶ 4 At the time of the sale, the new lots had not received individual tax parcel numbers, but the County assessor-treasurer had preliminarily approved the lots for tax segregation on April 20. On August 22, after Becker and the Collinses recorded the survey and the deed of sale, the County assessor-treasurer replaced the two tax parcel numbers, that identified the Hunter property, with seven new individual tax parcel numbers. Jill Guernsey, a County deputy prosecuting attorney, approved the tax segregation.
*384 ¶ 5 On November 28, Becker and the Collinses submitted a master application to the County Planning and Land Services for Lot 3. On November 29, they submitted the same applications for Lots 4 and 5. They also submitted critical fish and wildlife applications for all three lots. Becker and the Collinses sought to construct personal, single-family residences on the lots.
¶ 6 As part of their master application, Becker and the Collinses reviewed the property for wetlands. That wetland delineation revealed that the three lots lie within a Category IV Wetland and its associated buffer.[3] The PCC prohibits development of property that is situated on wetlands and their associated buffers. Chapter 18E.20 PCC. Despite this general prohibition, the PCC provides for an exception if its application deprives a landowner, such as Becker or the Collinses, reasonable use of his property. PCC 18E.20.050(A)(1). Here, the County informed Becker and the Collinses that there was not enough room for a building envelope outside the wetland and buffer areas and, as a result, if they wished to develop their property they needed to obtain reasonable use exceptions for the lots.
¶ 7 The criteria for reasonable use exceptions are jurisdiction specific. The County requires that an applicant meet all of the following eight criteria in order to obtain a reasonable use exception:
Decision Criteria. The Hearing Examiner may approve a reasonable use exception if the Examiner determines all of the following criteria are met:
a. The proposed development is located on a lot that was vested (see Chapter 18.160) prior to March 1, 2005 and there is no other reasonable use or feasible alternative to the proposed development with less impact on the critical area(s) and/or associated buffers including phasing or project implementation, change in timing of activities, buffer averaging or reduction, setback variance, relocation of driveway, or placement of structure.
b. The development cannot be located outside the critical area and/or its associated buffer due to topographic constraints of the parcel or size and/or location of the parcel in relation to the limits of the critical area and/or its associated buffer and a building setback variance or road variance has been reviewed, analyzed, and rejected as a feasible alternative.
c. The proposed development does not pose a threat to the public health, safety, or welfare on or off the site, nor shall it damage nearby public or private property.
d. Any alteration of the critical area(s) shall be the minimum necessary to allow for reasonable use of the property.
e. The inability of the applicant to derive reasonable use of the property is not the result of actions by the applicant in subdividing the property or adjusting a boundary line thereby creating the undevelopable condition after the effective date of this Title.
f. The proposal mitigates the impacts on the critical area(s) to the maximum extent possible, while still allowing reasonable use of the site.
g. The proposed activities will not jeopardize the continued existence of species listed by the State or Federal government as endangered, threatened, sensitive, or documented priority species or priority habitats.
h. The proposed activities will not cause significant degradation of groundwater or surface water quality.
PCC 18E.20.050(C)(2).
¶ 8 At issue here are requirement (a), whether the lots vested before March 1, 2005, and requirement (e), whether the inability of the applicant to derive reasonable use of the property is a result of the applicant's actions. PCC 18E.20.050(C)(2)(a), (e). In addition to the above criteria, an applicant for a reasonable use exception for wetlands and its associated buffers must also demonstrate that the "proposed activity will result *385 in minimum feasible alteration or impairment" to the wetlands' functional and habitat attributes. PCC 18E.20.050(C)(3).
¶ 9 An applicant for a reasonable use permit is required to submit documentation that supports each of the above-referenced criteria to the County planning staff. PCC 18E.020-.050(B). After the completed report is submitted, the County reviews the application and determines whether the applicant has met all of the required criteria; then it summarizes its findings and makes a recommendation either denying the application, approving the application, or approving the application with conditions. See PCC 18E.20.050(C)(8). On August 24, 2006, Becker and the Collinses submitted their applications along with a report from their consultant, H & S Consulting.[4] After the County reviewed their applications and reports, it determined that they met the required criteria and approved their reasonable use exception applications with conditions.
¶ 10 After the County compiles its report and recommendation, it submits the summary to the hearing examiner, who holds a public hearing on the request. PCC 18E.20.050(C)(1). The hearing examiner takes the testimony of the interested parties, asks questions of staff members and the applicants, and admits exhibits into the record. PCC 18E.20.050(C)(1). Ultimately, the hearing examiner considers all of the information and issues a final written decision, approving the application, approving the application with additional requirements, or denying the application. PCC 18E.20.050(C)(8). The hearing examiner's decision is final but may be appealed to the superior court under the Land-Use Petition Act (LUPA), chapter 36.70C RCW. PCC 18E.10.090; PCC 1.22.090(B)(1).
¶ 11 On March 21, 2007, the hearing examiner held a public hearing on Becker and the Collinses' applications. At the hearing, Lisa Spurrier, the County's environmental biologist, presented the County's report, recommending approval of the reasonable use exceptions subject to certain conditions. The hearing examiner questioned Spurrier about various reasonable use exception criteria and specifically about the division and vesting of the lots. Spurrier told the hearing examiner that the property was segregated on either February 22 or in June or July 2005. She further testified that if the lots had been segregated in June or July 2005, they would have been segregated outside the applicable vesting period. But she believed the lots had actually been divided on February 22, 2005, based on her conversations with Guernsey.
¶ 12 On April 12, 2007, Spurrier submitted a letter to the hearing examiner in which she reiterated her testimony that the lots were "legally created through a testamentary division which is exempt from the need to comply with state and local subdivision regulations" and that Guernsey had approved the exempted division in April 2005. Administrative Record (AR) at 301, Ex. 18. On the same day, the Sylvesters, one of Becker's and the Collinses' neighboring landowners, submitted a letter from their attorney addressing the vesting and division of the property. But the hearing examiner determined that this letter was untimely and did not make it part of the record. One of Becker's and the Collinses' other neighboring landowners, Rodney and Donna Hodel, also submitted a letter in which they disputed the lot division, as well as whether the lots were properly vested by March 1, 2005. Hodel further testified that he was "very concerned about how the two parcels became seven parcels." Transcription (TR) at 41. In response, Becker and the Collinses submitted a letter on their own behalf, denying that they were involved with the division of the Hunter property because the lots were created by testamentary division or segregation.
¶ 13 The Sylvesters and other neighbors, who opposed the development, expressed some concern about the March 1, 2005 vesting deadline, as well as the division of the property. Their chief concern with the proposal, however, was that septic systems proposed for the sites would not properly percolate through the ground.
*386 ¶ 14 On April 26, 2007, the hearing examiner filed findings, conclusions, and a decision in which he concurred with the County's recommendation and granted Becker and the Collinses' request for reasonable use exceptions, subject to conditions. Specifically, the hearing examiner interpreted the PCC to require that the lots simply exist before March 1, 2005, and that, despite some controversy as to how the lots were divided, there was no evidence in the record that Becker and the Collinses were involved in dividing the lots, creating their own hardship. To the contrary, the hearing examiner found that Becker and the Collinses were "bona fide purchasers of lots 3, 4, and 5, [which were] created prior to their purchase." Administrative Record (AR) at 11. The hearing examiner also found that even if Becker and the Collinses were in fact required to have "vested rights" within the meaning of the vested rights doctrine, that criterion would still be satisfied because the lots were divided before March 1, 2005. AR at 21.
¶ 15 On May 17, 2007, the Sylvesters appealed the hearing examiner's decision to the superior court under LUPA, based on two of the eight reasonable use exception criteria: first, that the lots vested before March 1, 2005, and, second, that Becker and the Collinses did not create their own hardship by dividing the property.
¶ 16 On December 7, 2007, the superior court reversed the hearing examiner's decision, finding that substantial evidence did not support the contested findings. Becker and the Collinses moved for reconsideration and submitted four supplemental declarations. The superior court struck the declarations as untimely and denied their motion for reconsideration. They then asked the superior court to remand the matter back to the hearing examiner so that they could submit additional evidence regarding the division of the lots. The trial court denied the motion. Becker and the Collinses appeal.[5]

ANALYSIS
¶ 17 Becker and the Collinses first contend that the superior court erred when it reversed the hearing examiner's decision because they satisfied all of the criteria for a reasonable use exception. Specifically, they argue that (1) the lots were vested before March 1, 2005, and (2) there is no evidence that they created their own hardship.
¶ 18 The Sylvesters counter that although testamentary segregation divided the interest in the Hunter property before March 1, 2005, the lots were not vested until the master applications were filed on November 28 and 29, 2005, well past the vesting deadline. The Sylvesters further argue that the evidence suggests that Becker and the Collinses divided the lots, not the original devisees and, as a result, they created their own hardship and are not entitled to a reasonable use exception. We hold that the lots were not vested by March 1, 2005, and, as a result, Becker and the Collinses cannot qualify for a reasonable use exception.

Standard of Review
¶ 19 Under LUPA, we stand in the shoes of the superior court and review the hearing examiner's land use decision de novo, based on the administrative record. Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999). We may grant relief from a land use decision here if the Sylvesters carry their burden of establishing one of the six standards of relief. The following LUPA standards are relevant here:
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts.
RCW 36.70C.130(1).
¶ 20 As the parties seeking relief from an administrative decision, the Sylvesters *387 bear the burden of proving that the hearing examiner erred. N. Pac. Union Conference Ass'n of the Seventh Day Adventists v. Clark County, 118 Wash.App. 22, 28, 74 P.3d 140 (2003). We review the hearing examiner's findings of fact for substantial evidence, that is, evidence sufficient to persuade a fair-minded person of the order's truth or correctness. Benchmark Land Co. v. City of Battle Ground, 146 Wash.2d 685, 694, 49 P.3d 860 (2002). And we review questions of law de novo. Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs., 151 Wash.2d 279, 290, 87 P.3d 1176 (2004). When we review an asserted error under LUPA, we grant "such deference as is due the construction of a law by a local jurisdiction with expertise," so long as that interpretation is not contrary to the statute's plain language. RCW 36.70C.130(1)(b); see Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 587, 90 P.3d 659 (2004).

Preservation
¶ 21 As an initial matter, Becker and the Collinses contend that the Sylvesters are prohibited from arguing (1) that the lots were not vested and (2) that Becker and the Collinses are responsible for dividing the property because the Sylvesters failed to object on these grounds before the hearing examiner.[6] The record belies this argument.
¶ 22 At the hearing, Hodel testified that he was "very concerned about how the two parcels became seven parcels." TR at 41. And the hearing examiner, in his findings of fact and conclusions of law, acknowledged the testimony, stating that Hodel "disagrees with the testamentary segregation of the property." AR at 6. Moreover, the hearing examiner referenced exhibits 13, 17, and 19, all which specifically address the issue of testamentary segregation.[7] Exhibit 13 is a letter from James Anderson and Dianne Meserve, Becker's and the Collinses' neighboring landowners, who opposed the project because of "[percolation] tests, the water runoff, the testamentary segregation, and the reasonable use of the land." AR at 7. Exhibit 17 is a letter from the Hodels, who, in addition to disputing whether the lots vested before March 1, 2005, also "dispute[d] the legality of the testamentary segregation."[8] AR at 7-8. Exhibit 19 is a letter from the Sylvesters and their attorney, in which their attorney addressed "the segregation of parcels within the project" and argued that they were not "created by the deadline set out in the Pierce County Code." AR at 7. But because the Sylvesters' letter was not timely submitted, the hearing examiner did not make it part of the record.
¶ 23 Becker and the Collinses responded to both issues below. On April 9, 2007, they submitted a letter in response to Hodel's concerns, stating that the lots were created by "Testamentary Segregation" and the creation was approved by Guernsey. AR at 347. It is also important to note that the parties conflated the issues of whether the lots timely vested and whether Becker and the Collinses were involved in the division of the property before the hearing examiner; they argued that the lots vested because testamentary division created the lots before March 1, 2005, while the Sylvesters and other neighbors argued that testamentary segregation did not create the lots but, rather, Becker and the Collinses did. Thus, the testimony and documentation about testamentary segregation goes to both issues. Although the issue of when the lots vested and whether Becker and the Collinses were responsible for the division were not the primary *388 issues before the hearing examiner, the Sylvesters and other concerned neighbors raised these issues, and Becker and the Collinses responded to these issues. Thus, Becker and the Collinses' initial argument fails.

Vested Rights Doctrine
¶ 24 Becker and the Collinses next contend that the trial court erred when it reversed the hearing examiner's determination that the lots vested before March 1, 2005. Specifically, they argue that the vested rights doctrine does not apply to the ordinance because the statute's plain language demonstrates that the "term `vested'. . . is a recognition that the lots existed prior to March 1, 2005, not that applicants have vested rights."[9] Appellants' Br. at 21-22. The Sylvesters counter that the vested rights doctrine applies and that the lots did not vest until Becker and the Collinses filed their master applications on November 28 and 29, 2005. We agree with the Sylvesters.
¶ 25 We review issues of statutory construction de novo. Port of Seattle, 151 Wash.2d at 612, 90 P.3d 659. But we give the hearing examiner's construction of the ordinance deference, so long as that interpretation is not contrary to the plain language of PCC 18E.20.050. Port of Seattle, 151 Wash.2d at 612, 90 P.3d 659. When faced with an unambiguous statute, we derive the legislature's intent from the plain language alone. Waste Mgmt. of Seattle, Inc., v. Utils. & Transp. Comm'n, 123 Wash.2d 621, 629, 869 P.2d 1034 (1994).
¶ 26 Here, the hearing examiner determined that the vested rights doctrine did not apply and that the lots "vested" when the Hunters died because, at that point, title to the property vested in the Hunter heirs, giving each of them a divided interest in the property. Thus, it appears that the hearing examiner interpreted the statute to require that the lots "exist" before March 1, 2005, not that the landowners have "vested rights." Despite Becker and the Collinses' argument to the contrary, for the following reasons we hold that the PCC's plain language demonstrates that vested rights must be obtained by filing an application, not by the mere existence as lots.
¶ 27 PCC 18E.20.050(C)(2)(a) requires the lots be "vested" before March 1, 2005, in order to qualify for a reasonable use exception. Immediately after the word "vested," PCC 18E.20-.050(C)(2)(a) references chapter 18.160 PCC, which specifically addresses "vesting" and the applicability of the vested rights doctrine. PCC 18.160.010(c) defines "vesting" as the "establishment of a date that is used to determine which development regulations the Department and Hearing Examiner will apply to the review of a complete application or approved development permit." The purpose of the vesting chapter is to "provide property owners, permit applicants, and the general public assurance that regulations for project development will remain consistent during the lifetime of the application." PCC 18.160.020. The vesting chapter also establishes time limitations on vesting for permit approvals and clarifies that "once those time limitations expire, all current development regulations and current land used controls apply." PCC 18.160.020. The vesting chapter further clarifies that it "applies to complete applications and permit approvals required by Pierce County pursuant to Title 18, including and limited to . . . use permit applications . . . and any other land use permit application that is determined by the Washington State legislature to be subject to the Vested Rights Doctrine." PCC 18.160.030 (emphasis added).
¶ 28 Thus, applications for reasonable use exceptions are subject to the vested rights doctrine, and the deadline for the applications *389 in order for the lots to "vest" was March 1, 2005. Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wash.2d 1, 16, 959 P.2d 1024 (1998) (the vested rights doctrine "applies only to permit applications," not whether the development of lots is subject to later enacted regulations). And although the vested rights doctrine is codified in statute for only two types of land use permit applications, building permits under RCW 19.27.095 and subdivision permits under RCW 58.17.033, case law has extended the vested rights doctrine to other application forms. Weyerhaeuser v. Pierce County, 95 Wash. App. 883, 890 n. 10, 976 P.2d 1279 (1999). As a result, when PCC 18E.20.050(C)(2)(1) and chapter 18.160 PCC are read together, the hearing examiner may approve a reasonable use exception under that particular set of codes only if the applicants submitted their completed applications by March 1, 2005. Here, because Becker and the Collinses admittedly did not submit their master application until November 28 and November 29, 2005, they are not eligible for a reasonable use exception because they fail to meet all of the required enumerated criteria.[10]
¶ 29 Affirmed.
We concur: ARMSTRONG, J., and PENOYAR, A.C.J.
NOTES
[1] Becker and the Collinses are involved with Grace Group, Inc., but the nature and extent of their involvement is unclear. While the record reflects that Eduardo Quiles is the agent for Grace Group, Inc., Becker's and the Collinses' roles are not defined.
[2] According to the statutory warranty deed, Becker and the Collinses purchased "parcels" instead of "lots." Administrative Record at 303. Although the terms "lot" and "parcel" are often used interchangeably, here not all of the parcels match the legal description of the lots on the survey. See PCC 18.25.030 ("lot" means "a designated parcel, tract, or area of land established by plat, subdivision, or as otherwise permitted by law, to be used, developed, or built upon as a unit"); PCC 18.25.030 ("parcel" is defined as "any portion, piece, or division of land, fractional part of subdivision of block, according to plat or survey; portion of platted territory measured and set apart for individual and private use and occupancy"). Becker, as an individual, purchased Parcels A, D, and E, which have the same legal descriptions as Lots 1, 4, and 5. The Quileses purchased Parcels B and G and, while Parcel B has the same legal description as Lot 2, it is unclear which lot Parcel G represents. Becker, doing business as Grace Group, purchased Parcel C, which has the same legal description as Lot 3. Finally, the Collinses purchased Parcel E, which has the same legal description as Lot 5. It is unclear how Becker and the Collinses both purchased Parcel E and perhaps it was a typographical error, but regardless of that, it is not relevant to our discussion.
[3] The County classifies its wetlands based on value from Category I to Category IV, with Category I being the highest value. PCC 18E.030.020(D)(1)-(4).
[4] The report referenced letters explaining why the lots vested before March 1, 2005, and why Becker and the Collinses were not involved in the division of the lots. But there are no letters attached to the report, nor can we find the letters in the record.
[5] Although Pierce County was named as a "nominal" party at the superior court as required by LUPA, Pierce County is not a party on appeal. See RCW 36.70C.040(2)(a) (local jurisdictions must be named when a party appeals a final land use decision issued by that jurisdiction).
[6] Becker and the Collinses also argue, for the first time in their reply brief, that the Sylvesters cannot claim that the testamentary division is invalid because they failed to appeal within the 21-day LUPA timeframe after the County assessor assigned the lots separate tax parcel numbers. RCW 36.70C.040(3). But the Sylvesters do not argue that the testamentary division of the lots was invalid; instead, they argue that Becker and the Collinses created their own hardship by being involved in the division.
[7] Exhibits 12 and 18 also address the issue of testamentary segregation. Exhibit 12 is an email from Guernsey verifying that she approved the segregation of the parcels. And exhibit 18 is a letter from Spurrier in which she also describes the testamentary segregation of the lots.
[8] The Hodels repeatedly referenced Becker and the Collinses failure to meet "deadlines," which appears to be in reference to the vesting issue. AR at 298.
[9] Becker and the Collinses assert that if we find that the vested rights doctrine applies, we effectively render this code unconstitutional because they would be unable to derive any reasonable use from their land, which they argue constitutes an unconstitutional taking as well as a violation of their right to substantive due process. But they fail to offer any argument in support of their blanket assertion, and we decline to address it. State v. Johnson, 119 Wash.2d 167, 171, 829 P.2d 1082 (1992) ("`naked castings into the constitutional sea'" are insufficient to merit judicial consideration) (quoting In re Rosier, 105 Wash.2d 606, 616, 717 P.2d 1353 (1986)) (internal quotation marks omitted).
[10] Because an applicant must meet all the criteria and Becker and the Collinses do not, we need not address whether they created their own hardship. Nevertheless, we note that the record does not support the trial court's finding in this regard.

Becker and the Collinses submitted two documents stating that they were not involved in the division of the property. The hearing examiner reviewed these documents and chose to believe them, despite the Sylvesters' and other neighbors' suggestions to the contrary. See Freeburg v. City of Seattle, 71 Wash.App. 367, 371-72, 859 P.2d 610 (1993) (we must accept the hearing examiner's views regarding credibility of the witness and the weight to be given reasonable but competing inferences). In light of the survey, the sale, and the preliminary approval of the individual tax parcel codes, along with Becker and the Collinses' assertion that they were not involved in the division, we find that substantial evidence supports the hearing examiner's finding that they did not divide the property and create their own hardship.