

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TERRY MILLER, et al, | ) | |
| | ) | No. 39628-2-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF RICHLAND, et al, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

STAAB, J. — This case arises from a decision by the city of Richland's hearing examiner granting Big Creek Land Company, LLC's site plan application for a proposed apartment complex. Following the hearing examiner's decision, opponents of the project filed three separate land use petitions. Although some of the issues raised in each petition overlap, each petition also raises unique issues. In consolidating the petitions, we have identified 10 issues and have categorized these issues into two sections.

In the first section, we address arguments that challenge whether the hearing examiner's decision complies with the Richland Zoning and Municipal Code. Within this section, we have identified the following issues raised by the petitioners: (1) the hearing examiner exceeded the scope of his authority in issuing a decision when a portion of the project was located on property zoned as low-density residential, (2) the

application should have been denied because it proposed an access road and retention pond on property zoned low-density residential, (3) the secondary access road did not comply with the requirements of the Richland Municipal Code, and (4) the hearing examiner erred in declining to address the issue of whether the development was barred by existing covenants.

We conclude that the hearing examiner committed clear error by failing to determine whether a non-residential driveway and retention pond are allowable uses on property zoned R-1-10 and by failing to determine whether a proposed non-residential driveway was required to comply with the City's width standards for such driveways, and if so, whether the proposed driveway met those standards. On the remaining issues we deny relief.

In the second section, we have grouped issues that relate to the community and the environment. These issues include the following arguments: (5) the hearing examiner erred in relying on the City's determination of nonsignificance, (6) the finding that the Amon Creek Natural Preserve was a Category II wetland was not supported by substantial evidence, (7) the application should not have been approved without a determination of whether the proposed stormwater system was adequate and prior to Big Creek obtaining permits required under the Clean Water Act of 1977 (CWA), 33 U.S.C. §§ 1251-1389, (8) the proposed development will unlawfully take birds under the Migratory Bird Treaty Act, (9) the proposed development violates the Endangered

Species Act of 1973 (ESA), 16 U.S.C. §§ 1531-1544, and (10) the hearing examiner did

not adequately articulate how his findings fulfilled the City's obligation to protect the

public health and welfare of its citizens.

We agree that substantial evidence does not support the hearing examiner's

finding that the Amon Creek Natural Preserve is a Category II wetland. We remand for

the hearing examiner to consider additional evidence if necessary, and to enter findings

and conclusions consistent with this decision. Otherwise, we deny relief on the

remaining issues because the petitioners have not met their burden of showing they are

entitled to relief under RCW 36.70C.130(1).

BACKGROUND

A.     RICHLAND MUNICIPAL CODE SITE PLAN APPROVAL PROCESS

Title 23 of the Richland Municipal Code (RMC) contains the city of Richland's

(City) zoning regulations. Development of multiple-family dwellings requires a project

to go through a site plan approval process. RMC 23.48.020. A site plan application is

generally part of the "preliminary stage in the development process relative to the

building permit application phase." *Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167

Wn.2d 242, 248, 218 P.3d 180 (2009), *abrogated on other grounds by Yim v. City of

Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019). Obtaining such approval requires a site

plan application to be submitted to the hearing examiner for review after which the

hearing examiner will hold a public hearing.  RMC 23.48.030; RMC 19.20.030.

Among other requirements, the site plan application must include: (a) boundaries

and dimensions of the property; (b) location and width of boundary streets;

(c) dimensions, location, and number of dwelling units for each existing or proposed

structure on the site; (d) roadways, walkways, off-street parking, and emergency vehicle

access; (e) fencing and landscaping, showing location, type, dimensions, and character;

and (f) location, dimensions, and character of recreational facilities and open space.

RMC 23.48.030.

The stated "purpose of the site plan approval process is to facilitate project design

that is compatible with adjacent land uses and is in keeping with the physical constraints

of the project site."  RMC 23.48.010.  The intent is not to resolve issues related to

"whether a particular land use activity is appropriate on a particular site."  RMC

23.48.010.  If a land use is otherwise permitted, it should not be denied during the site

plan review process "unless such uses cannot meet the development and/or performance

standards required for the use."  RMC 23.48.010.

The RMC gives the hearing examiner broad authority to approve a site plan

subject to whatever conditions "the hearing examiner determines to be necessary to

protect the public health, safety and welfare or otherwise bring a proposed development

4

into compliance with the purpose and intent of [the RMC's zoning regulations]." RMC

23.48.040. Permitted conditions include but are not limited to:

> increased setbacks, and buffers, including landscaping, fences and walls; restrictions on the type and location of outdoor lighting; surfacing of parking areas and driveways; the installation of stormwater drainage facilities; the construction and location of service roads and alleys; the points of vehicular ingress or egress; the regulation of the time and type of various activities; vibration, noise, odors or similar nuisances, and the type, size and location of signs.

RMC 23.48.040.

B.       BIG CREEK'S SITE PLAN APPLICATION

Big Creek Land Company, LLC owned property in the City on which it planned to

construct an apartment complex, or multiple-family dwellings. Because Big Creek's

project involved the construction of multiple-family dwellings, Big Creek was required to

submit a site plan application to the City's hearing examiner. *See* RMC 23.48.020.

Accordingly, Big Creek sought approval from the hearing examiner pursuant to

RMC 23.48.020 to develop four multiple-family residential buildings with up to 108

dwelling units. The proposed project site was primarily zoned R-3 (multiple family

residential) and all the residential buildings were proposed to be built on the R-3 zoned

property. However, the site also included a small parcel zoned R-1-10 (low-density

residential).

The proposed development included two access points, one via Broadmoor Street

to the north of the property and the other via John Court to the east. The Broadmoor

Street access was via a private driveway that crossed over portions of two private lots after exiting the project site, including crossing over land zoned R-1-10.

The land to the north and west of the proposed project was zoned R-1-10. The land to the east and south was zoned NOS (natural open space) and contained portions of the Amon Creek Natural Preserve.[1]



Figure 3 – Zoning Map

Admin. Rec. (AR) at 6.

---

[1] Throughout the parties' briefing they use different terms to refer to the Amon Creek Natural Preserve, such as "Amon Creek wetland and habitat reserve," "Amon Creek Preserve," and "Amon Nature Preserve," among others. *See, e.g.*, Br. of Appellant (Meadow Springs) at 6, 11; Br. of Appellant (Willowbrook) at 10. The parties do not explain whether these different terms are synonymous, but it appears that they all refer to the Amon Creek Natural Preserve, which is the term used in this opinion.

Big Creek's proposed site plan for the project also included a stormwater runoff system with proposed retention ponds located on the small parcel of property zoned R-1-10.[2]

In addition to needing approval from the hearing examiner pursuant to the RMC's site plan review process, the project required Big Creek to comply with the provisions of the State Environmental Policy Act (SEPA), ch. 43.21C RCW. As a result, Big Creek filed an environmental checklist with the City. After review of the checklist, the City, as the lead agency under SEPA, decided to utilize the optional determination of non-significance (DNS) process outlined in WAC 197-11-355, whereby it stated that it anticipated issuing a DNS and accordingly calling for public comment.

The Washington Department of Fish and Wildlife and the Washington Department of Ecology submitted comments on the proposed DNS. After reviewing the comments, the responsible official from the City issued a DNS on June 3, 2022. The DNS was not appealed.

Prior to the public hearing on Big Creek's site plan, the City issued a staff report in which it summarized the proposed project, including the land on which it would be situated and its anticipated environmental impacts. The staff report recommended the

---

[2] The image quality of the site plan documents is poor, and it is impossible to confirm that the site plan proposes developing retention ponds and an access road on property zoned R-1-10. However, Big Creek does not dispute this fact.

hearing examiner approve the site plan application subject to listed conditions of approval.

On June 13, 2022, after the DNS was issued, the hearing examiner held a public hearing on Big Creek's site plan review application. Prior to, during, and following the hearing, members of the public raised concerns related to the proposed development, including increased traffic, the environmental impact on the Amon Creek Natural Preserve and whether the project complied with applicable zoning provisions. Concerns were also raised that one of the parcels upon which Big Creek's project was proposed was subject to restrictive covenants that would preclude the proposed use.

In December 2022, the hearing examiner issued a decision approving Big Creek's site plan application subject to Big Creek complying with an extensive list of conditions of approval. The hearing examiner expressly declined to rule on the covenants issue raised at the hearing, instead conditioning his approval on resolution of the issue by the parties.

A coalition of community groups and individuals, comprised of nearby property owners and homeowners' associations, filed three separate appeals under the Land Use Petition Act (LUPA), ch. 36.70C RCW. The cases were transferred to this court pursuant

to RCW 36.70C.150(1),[3] and the parties stipulated to consolidation but still filed separate briefing.

Meadow Springs Second Nine Homeowners Association and property owners Lisa Dukes, Paul Johnson, and Raymond Swenson (collectively referred to as "Meadow Springs") filed a brief. Willowbrook Community Association, which appears to be a homeowner's association for an adjacent neighborhood, also filed a brief. And finally, property owner Terry Miller and Margaret and Richard Shallman, who own property over which Big Creek proposed developing an accessway, along with, again, Meadow Springs Second Nine Homeowners Association[4] (collectively referred to as "Miller") filed a brief.

ANALYSIS

A.    STANDARD OF REVIEW

In Washington, LUPA governs "judicial review of land use decisions made by local jurisdictions." RCW 36.70C.010. On appeal, "this court stands in the [same position as] the superior court and limits its review to the record" that was before the hearing examiner. *Pinecrest Homeowners Ass'n v. Cloninger & Assocs.*, 151 Wn.2d 279, 288, 87 P.3d 1176 (2004).

---

[3] RCW 36.70C.150(1) provides: "The superior court may transfer the judicial review of a land use decision to the court of appeals upon finding that all parties have consented to the transfer to the court of appeals and agreed that the judicial review can occur based upon an existing record."

[4] It is unclear why Meadow Springs is represented by two different attorneys on appeal who submitted two separate briefs.

9

"[T]he party seeking relief . . . bears the burden of [demonstrating that] one of the six" statutory grounds are met. *Pinecrest*, 151 Wn.2d at 288. This burden is well established but it bears emphasis here. It is not enough to identify or list these grounds once and then fail to apply them to the particular issues being raised. The petition should analyze the alleged error under the framework provided by the appropriate ground for relief. For example, a de novo review of an error is much different than review for clear error or substantial evidence. By failing to do so, a petitioner risks denial of review. *See Fischer Studio Bldg. Condo. Owners Ass'n v. City of Seattle*, 25 Wn. App. 2d 593, 524 P.3d 708 (2023) (petitioner's failure "to identify which one of the standards set forth in . . . RCW 36.70C.130(1) applies, let alone establish that it has met that standard" provided basis to deny review).

The six statutory grounds that may provide relief are:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party
seeking relief.

RCW 36.70C.130(1).

The standards in subsections (a), (b), (e), and (f) are questions of law this court

reviews de novo. *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768,

129 P.3d 300 (2006).

Subsection (c) requires a factual determination that this court reviews for

substantial evidence. *Id.* Substantial evidence is evidence sufficient to persuade a fair-

minded, rational person of the truth of an asserted fact. *Id.* "Our deferential review

requires us to consider all of the evidence and reasonable inferences in the light most

favorable to the party who prevailed in the highest forum that exercised fact-finding

authority." *Id.*

A "clearly erroneous" determination under subsection (d) requires this court to

apply the law to facts. *Id.* It requires this court to determine whether it is "left with a

definite and firm conviction that a mistake has been committed," while deferring to the

hearing examiner's factual determinations. *Id.*

In reviewing a land use decision, this court may affirm, reverse, or remand the

decision for modification or further proceedings. RCW 36.70C.140. "If the decision is

remanded for modification or further proceedings, the court may make such an order as it

finds necessary to preserve the interests of the parties and the public, pending further proceedings or action by the local jurisdiction." RCW 36.70C.140.

B.     COMPLIANCE WITH THE CITY'S ZONING AND MUNICIPAL CODE

As noted above, we construe ten separate issues in these consolidated LUPA cases. In order to provide for better organization, we have divided the issues into two general sections. In this section we consider the scope of the hearing examiner's jurisdiction and authority, whether the secondary access road and retention pond were allowed uses on property zoned R-1-10, whether the secondary access road as provided in the site plan complied with the RMC, and whether the proposed site plan needed to address covenants on the property.

   *1. Hearing Examiner's Jurisdiction and Authority*

Petitioner Miller argues the hearing examiner exceeded his authority by ruling on a site plan for a multiple-family project not located entirely on land zoned R-3, or for multiple-family dwellings. He seeks relief under RCW 36.70.130(1)(e) from a land use decision outside the authority or jurisdiction of the body or officer making the decision. As stated above, this is a question of law this court reviews de novo. *Cingular Wireless*, 131 Wn. App. at 768. We disagree and determine that the hearing examiner had authority to conduct the site plan review.

The hearing examiner concluded that the project required site plan approval under RMC 23.48.020, and thus he had jurisdiction to conduct a hearing and issue a decision on

the application for a site plan approval under RMC 23.48.030. RMC 23.48.020(B) states

that site plan approval is required for development of multiple-family dwellings "[w]here

construction of any multiple-family dwelling or dwellings containing an aggregate of 20

or more dwelling units is proposed for development in an R-3 . . . district." The hearing

examiner found

> most of the proposed site plan area, where the multi-family residential
> apartment buildings would be constructed with parking and associated
> improvements, is currently zoned R-3. Specifically, all of the property
> from the south end of "Parcel A" up to the northern boundary of "Parcel C"
> is zoned R-3, totaling over 14-acres. The smallest parcel, "Parcel D" is
> zoned R-1-10, but none of the apartment buildings are proposed on such
> parcel.

AR at 1769.

Under a plain reading of RMC 23.48.020(B) and .030, a site plan was required,

and the hearing examiner had jurisdiction. The site plan proposed construction of

apartment buildings on parcels zoned R-3. It did not propose construction of apartment

buildings on property zoned R-1-10.

Nevertheless, Miller argues RMC 23.48.020(B) should be read to authorize site

plan approval only where the entire proposed development is located solely in an R-3

district. He cites no authority for this interpretation. To the contrary, the code requires

site plan approval when the plan proposes the construction of "any" multi-family

dwelling in an R-3 district.

13

Even if we were to find the code ambiguous, we give deference to the hearing examiner's interpretation so long as it is not contrary to the code's plain language. *See Sylvester v. Pierce County*, 148 Wn. App. 813, 823, 201 P.3d 381 (2009) ("When we review an asserted error under LUPA, we grant 'such deference as is due the construction of a law by a local jurisdiction with expertise,' so long as that interpretation is not contrary to the statute's plain language.") (quoting RCW 36.70C.130(1)(b)). Further, this determination appears to be consistent with the purpose of chapter 23.48 RMC, which is "to facilitate project design that is compatible with adjacent land use and is in keeping with the physical constraints of the project site," because it would still allow for a site plan review to occur. RMC 23.48.010.

Miller contends that since the RMC does not specifically provide for approval of a site plan on parcels with mixed zoning, the application should be "addressed by the City of Richland—not the Examiner." Br. of Appellant (Miller) at 16. Miller cites no authority for this position. *See* RAP 10.3(a); *Regan v. McLachlan*, 163 Wn. App. 171, 178, 257 P.3d 1122 (2011) ("We will not address issues raised without proper citation to legal authority."). Arguably, if we were to determine that the hearing examiner did not have authority under RMC 23.48.020(B) to review a site plan of a project on land with parcels that have mixed zoning, the logical conclusion would be that a site plan approval would not be required. We do not reach this result because we conclude that site plan approval was required and the hearing examiner had jurisdiction to issue a decision.

2. *Approving Access Road and Retention Pond on Parcel Zoned R-1-10*

Petitioner Miller argues the hearing examiner erred when he approved a site plan providing for the construction of a second non-residential driveway and retention pond on a parcel zoned R-1-10. Miller claims non-residential driveways and retention ponds are neither primary uses of R-1-10-zoned lot, nor are they permitted accessory uses.

As grounds for relief, Miller cites RCW 36.70C.130(1)(b), (c), and (d). However, he fails to specifically articulate how these standards apply or how he meets these standards. We presume that Miller is claiming the hearing examiner's application of the law to the facts was clearly erroneous and proceed under this standard of review. A "clearly erroneous" determination under (d) requires this court to apply the law to facts and determine whether it is "left with a definite and firm conviction that a mistake has been committed," while deferring to the hearing examiner's factual determinations. *Cingular Wireless*, 131 Wn. App. at 768.

Richland's zoning regulations are covered by Title 23 of the RMC, and RMC 23.08.010 establishes use districts. Use district (or zone) R-1-10 is classified for "[r]esidential uses 10,000 square feet average lot size." RMC 23.08.010. The purpose of the R-1-10 zone is listed as follows:

> The single-family residential—10,000 (R-1-10) is a residential zone classification requiring a low density of population, providing protection against hazards, objectionable influences, building congestion, and lack of light, air, and privacy. Certain essential and compatible public service facilities and institutions are permitted in this district. This zoning

15

classification is intended to be applied to some portions of the city that are designated low-density residential (zero to five dwellings per acre) under the city of Richland comprehensive plan.

RMC 23.18.010(B).

Use district (or zone) R-3 is classified as "[s]ingle-family, duplex, multifamily residential; single-family 6,000 square feet; duplex 8,000 square feet; multifamily 1,500 square feet per dwelling unit." RMC 23.08.010. The purpose of the R-3 zone is listed as:

The multiple-family residential use district (R-3) is a residential zone classification allowing for the location of multiple-family dwellings, duplexes and attached and detached one-family dwellings and providing a high degree of protection for such uses and adjacent low-density residential development. This classification shall be designed to give protection from hazards, objectionable influences, building congestion, and lack of light, air, and privacy. Certain essential and compatible public service facilities and installations are permitted in this district. This zoning classification is intended to be applied to some portions of the city that are designated high-density residential (10.1 or more dwellings per acre) under the city of Richland comprehensive plan.

RMC 23.18.010(E).

RMC 23.18.030 provides a chart that lists zoning districts, such as R-1-10 and R-3 and the permitted uses for each of those zones, such as whether the land can be used for public park or a parking lot. Within this chart, "access road," "non-residential driveway," and "retention pond" are not listed as permitted uses for any zone in the "land use" column of RMC 23.18.030(E).

While Miller points out that the RMC does not expressly permit parcels zoned R-1-10 to be used for an access road or a retention pond, he fails to identify a code that

16

unambiguously prohibits this use. Thus, we reject Miller's argument that RMC categorically prohibits a non-residential driveway, access road, or retention pond on a parcel zoned R-1-10. Nevertheless, it is unclear whether unlisted uses may be allowed under certain circumstances.

In this case, the hearing examiner noted the site plan application included property zoned R-1-10, but did not address whether an access road and retention pond were permitted or allowed uses on property zoned R-1-10. We conclude this was clear error. One of the stated purposes of a site plan review is to determine if the particular land use activity is compatible with the particular site. RMC 23.48.010.

We remand for the hearing examiner to determine whether the access road and retention pond are allowed uses on parcels zoned R-1-10 and to make any supplemental findings that might be necessary.

*3. Whether the Non-Residential Driveway Complied with RMC*

Petitioners Miller and Willowbrook contend the hearing examiner erred in concluding the proposed site plan complied with the RMC. They assert that the hearing examiner failed to determine whether chapter 12.04 RMC, setting forth width requirements for driveways, applied to the non-residential driveway accessing Broadmoor Street, and if so, whether the driveway proposed in the site plan complied with those requirements. In addition, Miller maintains the proposed driveway violates the RMC's spacing and access requirements. In response, Big Creek argues that the

driveway requirements do not apply to the site plan, and even if they do, as conditioned, the hearing examiner's approval complied with the applicable provisions of the RMC.

We determine the hearing examiner's conclusion that the proposed site plan complies with the RMC was clear error where the hearing examiner failed to determine if the RMC required a minimum width requirement for the project's driveway.

Both petitioners indicate that the hearing examiner's decision was a clearly erroneous application of the law to the facts under RCW 36.70C.130(1)(d).

### a) Driveway Width Requirement

In several written objections, opponents of the project pointed out to the hearing examiner that the proposed second driveway failed to comply with driveway width standards under chapter 12.04 RMC. The written objections noted that the proposed access road is only 22 feet wide in certain areas whereas the code requires a minimum width of 35 feet for a non-residential driveway with exceptions under certain circumstances.

The hearing examiner concluded the fire code required the project be serviced by a second access road at least 20 feet wide. The hearing examiner also found the site plan proposed a secondary access to the development by way of a "private driveway" connecting to Broadmoor Street. However, despite the written objections, neither the staff report nor the hearing examiner address whether the additional width requirements in chapter 12.04 RMC applied to the private driveway. Nor did the hearing examiner make findings on the width of the proposed private driveway. The hearing examiner did

require, as a condition of approval of the site plan, that "the private driveway onto Broadmoor Street shall be constructed per City of Richland commercial driveway standard details."[5]  AR at 1788.

Petitioners do not challenge the hearing examiner's determination that the fire code applies to the project.  Instead, they contend the width requirements in chapter 12.04 RMC provide development standards in addition to the fire code.  Thus, the Petitioners contend that while the fire code requires a minimum width of 20 feet, the RMC requires non-residential driveways to be a minimum width of 35 feet.

As noted above, one of the purposes of a site plan review is to ensure the project design stays within the physical constraints of the project site.  RMC 23.48.010.  The applicant has the burden to demonstrate that the project meets the development standards and regulations required for the use.  *See* RMC 19.60.060; RMC 23.48.010.  The site plan must include proposed roadways and emergency vehicle access, and "shall be drawn in a concise and accurate manner, and of an appropriate scale for clarity in review."  RMC 23.48.030(D), (G).  Moreover, in approving the plan, the hearing examiner must find and conclude that the site plan "is consistent with the adopted comprehensive plan and meets the requirements and intent of the Richland Municipal Code."  RMC 19.60.095(A).

---

[5] While the hearing examiner used the term "commercial" driveway, such term is not found in the RMC.  Instead, it appears the that the hearing examiner was referring to a non-residential driveway.

Chapter 12.04 RMC is devoted to the design requirements of driveways. Specifically, RMC 12.04.010 provides that "[a]ny access from a public roadway to private property hereafter provided, constructed, altered, or repaired shall be by means of driveways which comply with the provisions of this chapter." A "[d]riveway" is defined as "any area, construction, or facility between the roadway of a street and private property to provide access for vehicles from the roadway of a street to private property." RMC 12.04.020.

The chapter goes on to mandate a minimum width for nonresidential driveways and then gives a definition for "nonresidential" driveways:

> All driveways other than a single residence driveway shall be considered nonresidential and be installed where customer, visitor and/or tenant parking areas are involved. The *minimum width for two-way operation shall be 35 feet* and 15 feet for one-way operation.

RMC 12.04.095 (emphasis added). Despite its apparent application to Big Creek's project, the hearing examiner did not make findings or conclusions on whether this code requirement applies and if so, whether the private nonresidential driveway complies with chapter 12.04 RMC.

Big Creek does not deny the private driveway is only 22 feet wide in certain areas. Rather, it maintains the driveway provisions of the RMC do not apply here. Instead, Big

Creek asserts Title 24 of the RMC applies. This may or may not be true. The problem is the hearing examiner did not decide this contested issue in his decision.[6]

In the alternative, Big Creek argues that if the width requirements of RMC 12.04.095 do apply, the condition included by the hearing examiner in his decision that "[t]he private driveway onto Broadmoor Street shall be constructed per City of Richland commercial driveway standard details" is sufficient to ensure the development complies with the 35-foot width requirement. AR at 1788. Willowbrook disagrees, claiming that the hearing examiner's reference to "standard details" was not concerned with the driveway width requirements in RMC 12.04.095 but rather was a reference to the "detailed engineering requirements established by the Public Works Department." Reply Br. of Appellant (Willowbrook) at 13.

For two reasons, we agree with the Petitioners that the condition imposed by the hearing examiner does not cure the deficient findings and conclusions. First, while the site plan is not required to include all the details of a proposed project, it is required to include the size and location of major improvements so the hearing examiner can determine if the site plan keeps within the physical restraints of the project site. RMC 23.48.010, .030. If a project requires a 35-foot driveway, but the site plan only provides

---

[6] We note, however, that Big Creek is seeking a site plan under Title 23. Title 24 concerns subdivisions of lots and Big Creek is not asking for a subdivision of lots. Finally, the hearing examiner has already determined that the second driveway is a "private driveway" and not an access road.

21

for a 22-foot driveway, increasing the width of the driveway to comply with a condition may impact setback requirements and the location of other improvements. The site plan should accurately set forth the dimensions of the second driveway.

In addition, the record shows disagreement between the Petitioners and the City over whether the width requirements applied only to the driveway's approach at the curb or throughout the driveway. The "standard" details drawing for driveways is included in the record, and references RMC 12.04.095. AR at 1355. The drawing focuses on a driveway's approach at the street connection. The drawing does not resolve whether the width requirements listed in RMC apply only to a driveway's approach or to the entire driveway.

We determine that the hearing examiner committed clear error by failing to determine if the driveway design standards of chapter 12.04 RMC applied to the second driveway, and if so, in failing to find whether the second driveway complied with those standards.

### b) *Driveway Spacing Requirement*

In addition to the above argument, Miller also maintains the proposed driveway violates the RMC's driveway spacing requirements. We disagree because Miller's argument conflicts with the plain meaning of the provisions of the RMC.

Where the meaning of a statute is plain on its face, this court should give effect to the plain meaning. *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 281,

242 P.3d 810 (2010). "Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

The RMC prohibits more than "two driveways on one street for any one ownership except as provided in RMC 12.04.130." RMC 12.04.070. RMC 12.04.130 provides that if a "single ownership is developed into more than one unit[s] of operation . . . or the necessity for additional access . . . is evident, additional driveways may be allowed by the public works director," beyond the two permitted by RMC 12.04.070. However, "[t]he minimum spacing of additional driveways shall be 300 feet." RMC 12.04.130.

According to Miller, there are three total proposed driveways for the project. The site plan application showed the relationship between the proposed driveway onto Broadmoor Street and existing improvements. There was an already existing driveway belonging to a residence 40 feet east of the proposed driveway and another belonging to a residence 30 feet west of the proposed driveway. Thus, Miller maintains that the proposed driveway onto Broadmoor Street was not properly spaced 300 feet from the existing driveways for the adjacent homes, as required by RMC 12.04.130. And further, proper spacing was impossible given the constraints of the property on which the proposal is located.

Big Creek does not respond to this argument, and this issue was not specifically addressed in the hearing examiner's decision. However, Miller's argument appears to overlook that RMC 12.04.170's limit of two driveways only applies when a single ownership has more than two driveways located on the same street. As stated above, Big Creek's proposed project only has two proposed driveways in total and only one of them is located on Broadmoor Street. Moreover, Miller's arguments related to the already-existing driveways concerns driveways that belong to adjacent properties and are therefore not a part of Big Creek's proposal. Since they belong to different properties, they cannot be said to be a part of the same "ownership," and therefore the limits of RMC 12.04.170 do not apply.

4. *Whether the site plan needed to address existing covenants on the property*

Petitioners Miller and Willowbrook initially argued the hearing examiner erred in approving the site plan application because it included a proposal for a driveway to be built over a parcel of land in violation of the covenants attached to that parcel. However, in its reply brief, Willowbrook concedes that this issue should be decided by a court of law and not the hearing examiner.

Miller also appears to admit the hearing examiner did not have authority to decide the covenants issue, but argues that the hearing examiner should have either denied the application because the issue had not been resolved or approved the application conditioned on the alteration of the covenants on the land. We conclude that whether

there are conflicting covenants on the parcel is not an issue to be decided during the site plan review and approval process.

Although Miller and Willowbrook fail to state which prong of RCW 36.70C.130 they are seeking relief under, it appears they may be arguing that the "land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise." RCW 36.70C.130(1)(b). This standard is a question of law this court reviews de novo. *Cingular Wireless*, 131 Wn. App. at 768.

"Administrative agencies are creatures of the legislature without inherent or common-law powers and may exercise only those powers conferred either expressly or by necessary implication." *State v. Munson*, 23 Wn. App. 522, 524, 597 P.2d 440 (1979). Agencies have the implied authority to carry out the duties they are statutorily given. *Tuerk v. Dep't of Licensing*, 123 Wn.2d 120, 125, 864 P.2d 1382 (1994). If an agency is granted a power, it is also granted "'everything lawful and necessary to the effectual execution of the power.'" *Id.* (quoting *State ex rel. Puget Sound Nav. Co. v. Dep't of Transp.*, 33 Wn.2d 448, 481, 206 P.2d 456 (1949)). However, an agency may not make determinations on an issue outside of its delegated functions or purpose. *Id*.

Determining the extent of a hearing examiner's jurisdiction requires "[a] detailed examination of the statutes and ordinances on which the[ir] authority . . . [is] based."

25

*Chaussee v. Snohomish County Council*, 38 Wn. App. 630, 636, 689 P.2d 1084 (1984).

In other words, a hearing examiner's authority is limited to whatever is "granted by the

creating body." *Durland v. San Juan County*, 174 Wn. App. 1, 10 n.6, 298 P.3d 757

(2012).

During the site plan approval process, project opponents pointed out that the

proposed access roads would be built on a parcel subject to covenants that would prevent

Big Creek from building the access road across it.  In his decision, the hearing examiner

did not rule on the issue, determining he did not "hold authority to rule upon private

property questions and private disputes raised through the hearing process."  AR at 1777.

Accordingly, he expressly declined to determine the effect of any covenants or legal

instruments on Big Creek's ability to use either of the access routes proposed and

required for the site plan.

Although the RMC appears to confer broad authority to the hearing examiner as it

relates to interpreting and applying zoning and regulatory ordinances, that authority does

not extend to resolving property disputes between private parties, such as the one the

Petitioners contend should have been addressed here.  The hearing examiner's authority

was limited to determining whether the site plan would comply with local zoning and

regulatory ordinances.  He was not charged with adjudicating the property rights of Big

Creek or other interested parties.[7] Accordingly, we conclude the hearing examiner did not erroneously apply the law in determining that the covenants issue was not within the scope of his authority.

Regardless of whether the hearing examiner had authority to address the covenants issue, he conditioned the approval of the site plan on Big Creek obtaining access rights for the parcels involved in the covenants issue:

> ***Access Rights for both proposed access routes must be confirmed before submittal of Building or other development permit applications.*** The applicant/developer must submit legal instruments confirming access rights to construct and develop the Site Plan as proposed, with two access routes, in a form deemed satisfactory to the City Attorney, prior to submittal of Building, Construction, Grading or other plans required to obtain development permits necessary to construct any aspect of this project.

AR at 1783. The hearing examiner's condition requires Big Creek to confirm it has access rights allowing it to construct the proposed developments on the property on which the access roads are proposed before it can obtain any development permits. Because the condition requires Big Creek to demonstrate it has not only access rights but specifically rights to construct according to the site plan, this condition is sufficient to ensure resolution of the covenants issue precedes any development on the property.

---

[7] It is also worth noting that, although experience in the field of law is "desirable," the hearing examiner is not actually required to be a lawyer and therefore may also lack the legal expertise necessary to handle such questions. *See* RMC 19.25.040; *Chaussee*, 38 Wn. App. at 638.

Miller disagrees with the terms of this condition, arguing that alteration of the property on which the access roads are proposed should have been a requirement or a condition of approval. Although not explicitly stated, Miller appears to take the position that the condition imposed by the hearing examiner was too broad. Instead of simply confirming it has access rights, Miller maintains Big Creek should be required to show alteration of the plats.

The RMC gives the hearing examiner authority to impose a wide variety of conditions on a site plan approval. RMC 23.48.040. Miller does not dispute that the condition imposed by the hearing examiner was within the discretion given by the RMC. Nothing in the hearing examiner's decision or condition of approval prevents a private party with standing from bringing suit in a court of law to challenge whether Big Creek's access road violates a covenant on the property.

The hearing examiner did not erroneously apply the law when he determined that addressing the covenants issue was outside the scope of his authority.

C.    COMMUNITY AND ENVIRONMENTAL ISSUES

Under this second section, we have identified six remaining arguments that generally raise issues pertaining to the project's impact on the community and environment. Under this section we will address the hearing examiner's reliance on the City's DNS, the findings supporting the conclusion that the Amon Creek Natural Preserve was a Category II wetland, whether the site plan violated the CWA, Migratory

28

Bird Treaty Act, or Endangered Species Act, and whether the hearing examiner's

findings on the public health, safety, and welfare were sufficient.

5. *Determination of Nonsignificance*

Meadow Springs argues the hearing examiner erred in deferring to and adopting

the City's DNS. Meadow Springs does not identify which of the statutory grounds for

relief applies to this alleged error. *See* RCW 36.70C.130(1). We deny relief on this issue

because the DNS was a separate decision that was not appealed and is not before this

court.

a) *SEPA Background*

SEPA was originally enacted in 1971 to "(a) [f]oster and promote the general

welfare; (b) create and maintain conditions under which human beings and nature can

exist in productive harmony; and (c) fulfill the social, economic, and other requirements

of present and future generations of Washington citizens." RCW 43.21C.020(1). Its

purposes include to "[a]ssure for all people of Washington safe, healthful, productive,

and aesthetically and culturally pleasing surroundings;" "[a]ttain the widest range of

beneficial uses of the environment without degradation, risk to health or safety, or other

undesirable and unintended consequences;" and "[m]aintain, wherever possible, an

environment which supports diversity and variety of individual choice." RCW

43.21C.020(2)(b), (c), (e).

In furtherance of its policies, SEPA requires state or local agencies to evaluate the environmental impacts of certain project proposals and make a "threshold determination" of whether "the proposal is likely to have a probable significant adverse environmental impact." WAC 197-11-330(1)(b); WAC 197-11-310. To facilitate this "threshold determination," a permit applicant must prepare an environmental checklist that provides "information reasonably sufficient to evaluate the environmental impact of the proposal." *Anderson v. Pierce County*, 86 Wn. App. 290, 301, 936 P.2d 432 (1997).

If "a proposed agency action requires SEPA environmental review, the relevant agencies will [determine] the 'lead agency'" that will be charged with performing the environmental analysis. *Wild Fish Conservancy v. Dept. of Fish & Wildlife*, 198 Wn.2d 846, 856, 502 P.3d 359 (2022). The lead agency will then evaluate the probable environmental impact of the proposal. *Id*. This includes a "threshold determination of whether" "the proposal is not likely to have significant adverse [environmental] impact[ ]." *Id*.; *see* WAC 197-11-330(1)(b).

"If the agency determines the proposal is *not* likely to have significant adverse [environmental] impact, it will issue a determination of nonsignificance (DNS), and no [additional] environmental review" will occur. *Wild Fish Conservancy*, 198 Wn.2d at 856.

*b)* Review of SEPA Determination

Although many municipal codes contain provisions allowing for an appeal of a responsible official's threshold determination, as the hearing examiner noted, the RMC does not provide for such an appeal. *See generally* RMC 22.09.010-22.09.290. Thus, any appeal of the responsible official's threshold determination must occur under LUPA, meet one of the standards set out in LUPA, and be filed within LUPA's 21-day deadline. *See* RCW 36.70C.040(2), (3).

Where a party is "challenging a governmental agency's determination, SEPA requires the court give substantial weight to the agency's decision." *Wild Fish Conservancy*, 198 Wn.2d at 866. This court should "recognize and defer to the administrative agency's environmental expertise." *Id.*

*c) Application*

Meadow Springs does not state which prong of RCW 36.70C.130(1) it seeks relief under for this issue. They appear to be arguing that the hearing examiner's findings related to the SEPA DNS were not supported by substantial evidence under RCW 36.70C.130(1)(c).[8] Accordingly, this issue is analyzed under that standard. As explained

---

[8] Although a SEPA DNS is reviewed under a clearly erroneous standard of review, this standard of review does not apply here because we are reviewing the hearing examiner's findings related to the SEPA DNS, not the SEPA DNS itself.

above, substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of an asserted fact. *Cingular Wireless*, 131 Wn. App. at 768.

The City anticipated it would issue a DNS for Big Creek's proposal and requested public comment under WAC 197-11-355.[9] In response, several agencies and organizations sent comments to the City regarding various aspects of the project. In November 2020, based on comments it received during the SEPA review process, the City informed Big Creek it needed additional information before it could issue a final SEPA determination. Then, on June 3, 2022, the City issued a SEPA DNS.

The DNS was not appealed. And although the hearing examiner relied on the DNS to support his decision, as he acknowledged, he did not have authority to review the merits of the DNS under the RMC. Accordingly, we reject any attempt by Meadow Springs to argue the merits of the DNS because there was no appeal of the DNS within the 21-day window as required by LUPA, and any argument is therefore untimely.

---

[9] WAC 197-11-355(1) states:

> If a GMA county/city with an integrated project review process (RCW 36.70B.060) is lead agency for a proposal and has a reasonable basis for determining significant adverse environmental impacts are unlikely, it may use a single integrated comment period to obtain comments on the notice of application and the likely threshold determination for the proposal. If this process is used, a second comment period will typically not be required when the DNS is issued.

Meadow Springs asserts the DNS was not a final appealable agency decision until it was "adopted" by the hearing examiner, appearing to argue that substantial evidence did not support the DNS and therefore substantial evidence did not support the hearing examiner's findings related to the DNS. Br. of Appellant (Meadow Springs) at 21. But Meadow Springs points to no authority supporting this contention. Moreover, its statement is contrary to the procedural requirements of SEPA and unsupported by the RMC because the RMC does not allow for an appeal of a SEPA determination to the hearing examiner and thus under SEPA, the determination must be appealed in the courts. Furthermore, the hearing examiner relied on the DNS in making his decision. He did not "adopt" the decision. Thus, we disagree with this argument.

Meadow Springs also appears to attack the hearing examiner's reliance on the DNS in making his decision. It alleges that the hearing examiner's deference to the decision "lacks any rational thought, beyond his desire to totally avoid any and all independent thought about the staff's DNS conclusion." Br. of Appellant (Meadow Springs) at 9.

However, Meadow Springs' argument is inapposite. In his decision, the hearing examiner said that the staff report "credibly summarize[d] the extensive public noticing, comments, and SEPA review" for the project and following review of comments, application materials, and professional reports, the City issued a DNS. AR at 1771. The hearing examiner also noted that the City's SEPA responsible official was present for the

entire hearing on the site plan application and received copies of all the written comments presented to the hearing examiner. Though he had discretion to do so, the responsible official did not indicate that the SEPA DNS should be modified or withdrawn. The hearing examiner then went on to explain that substantial weight should be given to the DNS and it was supported by a preponderance of the evidence in the record. Based on these facts, the hearing examiner appears to have rationally considered and weighed the DNS's conclusion and appropriately relied on it to support his decision.

Meadow Springs attempts to now challenge the weight and deference given by the hearing examiner to the DNS. This argument appears to be an attempt to get around the fact that Meadow Springs failed to file a timely appeal of the DNS. But as the SEPA DNS was a final agency action that had not been challenged, there is no reason why the hearing examiner should not have given it substantial deference. Indeed, as explained above, courts must defer to an agency's environmental expertise, even when reviewing a challenged SEPA determination. *See Wild Fish Conservancy*, 198 Wn.2d at 866.

We decline to address Meadow Springs' arguments related to the merits of the SEPA DNS because the DNS was not timely appealed. The hearing examiner properly relied on the DNS as it was a final agency decision. Thus, Meadow Springs has failed to show that the hearing examiner's findings related to the DNS were not supported by substantial evidence.

*6. Findings and Conclusions Related to Amon Creek Natural Preserve*

Willowbrook raises several arguments as to why the hearing examiner's finding, that the Amon Creek Natural Preserve was a Category II wetland, was not supported by substantial evidence.[10] We agree with Willowbrook that the "Critical Area Report" prepared by Big Creek's experts was unreliable because it was based on outdated data. We also agree that the lack of comment from the Department of Ecology and a separate Critical Area Report for an adjacent wetland do not support the finding that Amon Creek Natural Preserve can be characterized as a Category II wetland.

Although Willowbrook does not cite to the relevant provision of LUPA, it appears that they are arguing that the hearing examiner's finding on the Amon Creek Natural Preserve's classification is not supported by substantial evidence. RCW 36.70C.130(1)(c). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of an asserted fact, and this court's deferential review requires it to consider the evidence in the light most favorable to Big Creek as the prevailing party. *See Cingular Wireless*, 131 Wn. App. at 768.

---

[10] Big Creek claims that Willowbrook did not raise the argument regarding the outdated delineation data before the hearing examiner and therefore has waived it on appeal under RAP 2.5. However, Willowbrook's expert did bring the issue to the attention of the hearing examiner in a letter submitted prior to the hearing on Big Creek's site plan application. The issue was not waived.

"Prior to the issuance of a SEPA threshold determination for a proposal, a wetland determination, wetland delineation report, fish and wildlife habitat conservation area report, geologic hazard report or critical aquifer recharge area report must be submitted to the administrator for review if such critical areas are indicated on any portion of the site." RMC 22.10.370(B)(1). A "[w]etland delineation" is "a delineation done in accordance with the approved federal wetland delineation manual and applicable regional supplements as provided for in WAC 173-22-035." RMC 22.10.040.

Title 173 of the WAC contains regulations promulgated by the Department of Ecology. And WAC 173-22-035 similarly states: "Identification of wetlands and delineation of their boundaries pursuant to this chapter shall be done in accordance with the approved federal wetland delineation manual and applicable regional supplements."

Congress has bestowed upon the United States Army Corps of Engineers authority to regulate activities in navigable harbors and rivers as well as wetlands adjacent to the navigable waterways. *U.S. v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 122, 135-39, 106 S. Ct. 455, 88 L. Ed. 2d 419 (1985). Pursuant to this authority, the Army Corps of Engineers published the *Corps of Engineers Wetland Delineation Manual*[11] for the identification and delineation of wetlands. The Army Corps has indicated in its manual

---

[11] ENV. LABR'Y, U.S. ARMY CORPS OF ENG'RS, CORPS OF ENGINEERS WETLANDS DELINEATION MANUAL (Jan. 1987), https://www.nae.usace.army.mil/Portals/74/docs/regulatory/JurisdictionalLimits/wlman87.pdf.

and explicitly stated in a regulatory guidance letter that a "wetland delineation" expires after five years.[12]  This is because of the significant changes that may occur over "a five-year period due to changes in hydrology, land uses, and plant species composition."[13]

Among the "applicable regional supplements" referred to in the RMC, the Department of Ecology has published a manual entitled the *Wetland Rating System for Eastern Washington*.[14]  The manual sets out the standards for conducting a wetland delineation and categorizing a wetland from category I to category IV.  *See* WETLAND RATING SYSTEM, *supra*, at 5-10, 27-86.  It is clear from the manual that determining a wetland's classification requires a site visit.  *See* WETLAND RATING SYSTEM, *supra*, at 15.

The Amon Creek National Preserve's classification is significant because the classification, in conjunction with the habitat score, determines the buffer Big Creek must

---

[12] CORPS OF ENGINEERS WETLANDS DELINEATION MANUAL, *supra*, at 41 ("each plant community type present in the project area must have been quantitatively described within the past 5 years"); U.S. Army Corps of Eng'rs, Regulatory Guidance Letter No. 05-02 (June 14, 2005), https://usace.contentdm.oclc.org/utils/getfile/collection /p16021coll9/id/1246.

[13] *Wetland delineation resources*, DEPT. OF ECOLOGY, https://ecology.wa.gov /water-shorelines/wetlands/tools-resources/delineation-resources (last visited Jan. 15, 2025).

[14] THOMAS HRUBY, DEP'T OF ECOLOGY, WASHINGTON STATE WETLAND RATING SYSTEM FOR EASTERN WASHINGTON: 2014 UPDATE (Oct. 2014) (Pub. No. 14-06-030) (Wetland Rating System), https://apps.ecology.wa.gov/publications/documents /1406030.pdf.

provide for between any "high impact land use"[15] and the wetland. *See* RMC

22.10.110(C). Generally, the higher the wetland classification (with category I being the

highest and category IV being the lowest), the larger the buffer required. *See* RMC

22.10.110(D). Based on a determination that the Amon Creek Natural Preserve was a

Category II wetland with a habitat score of 7, Big Creek's site plan application included a

150-foot buffer between the development and the wetland.

Here, the hearing examiner agreed with Big Creek's critical areas report and

appeared to find that the Amon Creek Natural Preserve was a Category II wetland.[16] In

making this finding, the hearing examiner noted the lack of "written comment from [the

Department of] Ecology questioning or rejecting the City's SEPA DNS, which [was]

based in part on applying buffers [required] for . . . a Category II wetland." AR at 1774.

The hearing examiner also stated that "previous professional studies by qualified

wetlands experts have concluded that the [Amon Creek Natural Preserve] at issue in this

project [was] a Category II Wetland." AR at 1774.

---

[15] "High impact land use" includes land uses like Big Creek's proposed apartment complex. *See* RMC 22.10.040, 22.10.110(C).

[16] Although the hearing examiner found that the comments from project opponents that the Amon Creek National Preserve should have been classified as a category I wetland were "not as credible as the Staff Report . . . that identified . . . [it] as a Category II wetland," the hearing examiner did not explicitly find that the wetland was a Category II wetland. AR at 1773-74.

Willowbrook makes three arguments to support their contention that the hearing examiner's finding was not supported by substantial evidence.

### a) *The critical areas report was outdated because the site visit upon which the report relied occurred in 2016*

First, Willowbrook claims the critical areas report relied on by the hearing examiner was based on out-of-date data under the standards set forth the by the Army Corps of Engineers and therefore was unreliable and could not properly support the hearing examiner's finding that the Amon Creek Natural Preserve was a Category II wetland.

As explained above, the Army Corps of Engineers has made it clear that wetland delineation data has a five-year shelf life. Thus, if data is more than five years old, it may not be relied on to classify a wetland.

The original onsite assessment of the Amon Creek Natural Preserve occurred in September 2016. The hearing for the site plan application did not occur until June 2022—nearly six years after the onsite assessment. Big Creek points out that its critical areas report was originally dated February 2018, when the data was only two years old, and then revised in April 2021. However, the Army Corps of Engineers has made it clear that a delineation, which requires an onsite visit, expires after five years. The relevant date is the delineation, not the date of the report.

There is no indication that the experts who prepared the Critical Area Report returned to the Amon Creek Natural Preserve in the five years prior to the hearing as part of their revision of the report. Rather, the report was simply reissued so that it contained a later date.

Big Creek also points to a letter from the Department of Ecology that supports the hearing examiner's Category II classification. Relying on the data from the 2016 onsite assessment, this letter was written in 2020, at a time when the data on the Amon Creek Natural Preserve was still current. By the time of the hearing in June 2022, the Department of Ecology's letter also relied on expired data.

We agree with Willowbrook's argument and conclude that the hearing examiner erred in relying on the Critical Area Report in finding that the Amon Creek Natural Preserve was classified as a Category II wetland because the report was based on outdated data.

> b) *Whether the critical areas report was created using unreliable methodology*

Next, Willowbrook argues the Critical Area Report was unreliable because the assessment only delineated and categorized the subject property and land within 300 feet of the property, contrary to the guidelines established by the manual from the Department

of Ecology.[17] We have already determined that the Critical Area Report was unreliable,

so we decline to address this issue. We note that the evidence on the methodology used

to create the Critical Area Report is contradictory. On remand, the parties may raise this

argument before the hearing examiner.

> c) *Lack of comment from Ecology and the delineation from a nearby*
> *wetland were insufficient to support the hearing examiner's finding of a*
> *Category II classification*

Finally, Willowbrook contends the remaining evidence cited by the hearing

examiner—the lack of a challenge from the Department of Ecology to the SEPA DNS

(which relied on the Category II classification) and the delineation from a nearby

wetland—were insufficient to support the Category II finding. We agree.

The hearing examiner found the Department of Ecology generally agreed with the

testimony from Big Creek's expert that the Amon Creek Natural Preserve was a Category

II wetland. The hearing examiner then noted that while the Department of Ecology did

---

[17] Willowbrook also argues that the hearing examiner should not have relied on the Critical Area Report because Willowbrook presented testimony from an expert that questions related to the wetland habitat had been improperly answered and—had the expert properly answered the questions—it would have resulted in a category I classification. Although Willowbrook's expert did make such claims, the hearing examiner ultimately found the expert not credible as she had not actually visited the site of the proposed project and therefore did not rely on her testimony. AR 427, 1773. Willowbrook's argument related to its expert's testimony is a request for this court to make a credibility determination, and we decline to do so. *See Bartel v. Zucktriegel*, 112 Wn. App. 55, 62, 47 P.3d 581 (2002) (court of appeals is "not entitled to weigh . . . the credibility of witnesses").

not directly verify Big Creek's report, the Department of Ecology also did not submit a

comment questioning or recognizing "the City's SEPA DNS, which [was] based in part on

. . . the Category II wetland" classification. AR at 1774. The hearing examiner then went

on to note that under WAC 197-11-545,[18] which addresses the effect of no comment after

a SEPA notice, he could assume the Department of Ecology had no information relating to

the potential impact of the project as it related to the hearing examiner's authority, and the

lack of comment could "be construed as lack of objection." AR at 1774.

Although the lack of comment from the Department of Ecology on the City's

SEPA DNS means they have waived any objection under WAC 197-11-545, Meadow

Springs is correct in stating that the lack of comment was not substantive evidence

supporting the hearing examiner's determination. Instead, it simply meant that any

arguments the Department of Ecology might have raised contesting the DNS in the future

had been waived.

---

[18] WAC 197-11-545(1) provides:

> If a consulted agency does not respond with written comments within the time periods for commenting on environmental documents, the lead agency may assume that the consulted agency has no information relating to the potential impact of the proposal as it relates to the consulted agency's jurisdiction or special expertise.

And WAC 197-11-545(2) states:

> Lack of comment by other agencies or members of the public on environmental documents, within the time periods specified by these rules, shall be construed as lack of objection to the environmental analysis, if the [public notice] requirements . . . are met.

Additionally, in the decision, the hearing examiner noted that material submitted by the City and Big Creek showed that "previous professional studies by qualified wetlands experts have concluded that the Amon wetland at issue in this project is a Category II Wetland." AR at 1774.

This statement by the hearing examiner appears to be referring to documents that were submitted post-hearing. Following the hearing, a Critical Area Report from May 2022 that had been prepared for a project the City had proposed was submitted to the hearing examiner. The proposed project area that was the subject of the report was the southern portion of the Amon Creek Natural Preserve. The report classified "Wetland C", located near the project site, as a Category II wetland. This Critical Area Report concerning a nearby, but separate, area was apparently relied on by the hearing examiner to support his finding that the Amon Creek Natural Preserve at issue here was properly classified as a Category II wetland.

It appears from the maps included in the May 2022 report that the area delineated was southwest of the Big Creek project. Although there might be some overlap between the area analyzed by this report for the City's project and the area that should have been analyzed by the report for the Big Creek project, they involved two different sites. A proper wetland delineation must consider the entire wetland. WETLAND RATING SYSTEM, *supra*, at 15. The delineation of a separate wetland considered by the hearing examiner did not consider the entire Amon Creek Natural Preserve at issue in this case.

43

Thus, the prior report classifying a nearby area as a Category II wetland did not support the hearing examiner's finding.

At oral argument before this court, Big Creek appeared to claim that any concerns regarding the Amon Creek Natural Preserve's Category II classification were cured by the hearing examiner's adoption of the conditions included in the staff report.

The hearing examiner did not adopt the conditions suggested by the staff report verbatim. Instead, the hearing examiner specifically noted it was approving the site plan application, "subject to conditions of approval as recommended by City staff *and modified herein*." AR at 1781 (emphasis added). Although the conclusion indicates that the hearing examiner's decision incorporated conditions of approval listed in the staff report, they are incorporated as modified in the decision, not as they were written by the staff. Thus, we disagree with Big Creek's characterization of the hearing examiner's conclusion.

Regardless, the staff report suffers from the same problem because it relied on Big Creek's Critical Area Report in its assessment of the Amon Creek Natural Preserve. And the staff report did not make any recommended findings or conclusions regarding the Amon Creek Natural Preserve.

The hearing examiner did not directly find that the Amon Creek Natural Preserve should be characterized as a Category II wetland, but his other findings indirectly reach this result. The evidence relied on by the hearing examiner to reach this indirect finding

was unreliable and failed to provide substantial evidence. We remand for the hearing examiner to, if he deems it necessary, call for additional evidence, enter supported findings, and reconsider the factual issue and the site plan application. *See Little v. King*, 160 Wn.2d 696, 699, 161 P.3d 345 (2007) ("When the findings and conclusions are missing or are defective, the proper remedy is remand for entry of adequate ones unless the appellate court is persuaded that sufficient basis for review is present in the record.").

### 7. Clean Water Act

Willowbrook argues the hearing examiner erred in approving the site plan application without analyzing whether the proposed stormwater system was adequate to meet the development's needs. Meadow Spring also appears to contend that the project violates the CWA, similarly contending that the hearing examiner's failure to require Big Creek to obtain a permit for stormwater runoff violated the CWA.[19]

Willowbrook and Meadow Springs fail to cite to the prong of RCW 36.70C.130 that they are claiming to be entitled to relief under. However, it appears they are contending that the hearing examiner's decision was either an "erroneous interpretation of the law" or "a clearly erroneous application of the law to the facts."

---

[19] Meadow Springs seemingly argues that the hearing examiner's decision violated the CWA because it did not require the permits mandated by the CWA. *See* Br. of Appellant (Meadow Springs) at 11-12, 14-17. However, Meadow Springs' briefing on this issue fails to sufficiently cite to proper legal authority, articulate the facts supporting the asserted CWA violation, or otherwise explain what the error is. Thus, we decline to address the alleged CWA violation. *See Stubbs*, 144 Wn. App. at 652.

RCW 36.70C.130(1)(b), (d). Whether a court has erroneously interpreted the law under subsection (b) is a question of law this court reviews de novo. *Cingular Wireless*, 131 Wn. App. at 768. A "clearly erroneous" determination under subsection (d) requires this court to apply the law to facts to determine whether it is "left with a definite and firm conviction that a mistake has been committed," while deferring to the hearing examiner's factual determinations. *Id.*

### a) Clean Water Act and RMC's Stormwater Provisions

"Stormwater runoff is one of the most significant sources of water pollution in the nation, at times 'comparable to, if not greater than, contamination from industrial and sewage sources.'" *Env't Def. Ctr., Inc. v. U.S. Env't Prot. Agency*, 344 F.3d 832, 840 (9th Cir. 2003) (quoting Richard G. Cohn-Lee and Diane M. Cameron, *Urban Stormwater Runoff Contamination of the Chesapeake Bay: Sources and Mitigation*, 14 ENV'T PROF. 10, 10 (1992)). The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this purpose, the CWA prohibits the discharge of all pollutants except where there is compliance with specific provisions of the act related to matters including effluent limitations, national standards of performance, and pretreatment standards. 33 U.S.C. § 1311.

The CWA allows certain entities to obtain National Pollutant Discharge Elimination System (NPDES) permits, which allow the entities to discharge a limited

amount of pollutants into surface waters. 33 U.S.C. § 1342(a). Additionally, 33 U.S.C. § 1342(b) provides that each state may create its own permit program to implement the CWA as long as the program complies with federal guidelines from the Environmental Protection Agency (EPA).

The Department of Ecology has promulgated regulations pursuant to the authority granted to the states in 33 U.S.C. § 1342(b). Among those regulations, a NPDES permit is required for discharge of pollutants into any surface water from a point source. WAC 173-220-020. "'Point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." WAC 173-220-030(18). "'Surface waters of the state' . . . includes lakes, rivers, ponds, streams, inland waters, wetlands, ocean, bays, estuaries, sounds, and inlets." WAC 173-220-030(21). Stormwater discharge associated with industrial activity is included in the NPDES permit requirement. *See Pedersen v. Dep't of Transp.*, 25 Wn. App. 781, 786, 611 P.2d 1293 (1980).

Pursuant to its authority under the CWA, the Department of Ecology has also issued a 2019 *Stormwater Management Manual for Eastern Washington* (SWMMEW), which provides guidelines and practices that, if followed, "should result in compliance with existing regulatory requirements for stormwater, including compliance with the

federal Clean Water Act." SWMMEW, *supra*, at 44.[20] The manual lays out the step by step process for creating stormwater site plans. SWMMEW, *supra*, at 109. It states that a preliminary design of a stormwater systems "is necessary to determine how they will fit within and serve the entire preliminary development layout." SWMMEW, *supra*, at 111-12. The manual further notes that the development of a preliminary design may cause the designer to reconsider a project's layout. SWMMEW, *supra*, at 111-12.

In addition to the above provisions, Title 16 of the RMC lays out "stormwater management requirements" in order "to regulate stormwater runoff from construction, development, and redevelopment." RMC 16.06.010. Title 16's provisions apply to construction activities and new developments, including the proposed project from Big Creek. RMC 16.06.020. All construction activities subject to Title 16 must comply with the standards and requirements set forth in the Department of Ecology's SWMMEW.[21] RMC 16.06.030(A). Additionally, all projects are required to "submit a stormwater pollution prevention plan." RMC 16.06.030(C).

---

[20] https://apps.ecology.wa.gov/publications/documents/1810044.pdf.
[21] Although there is a draft 2024 version of the SWMMEW available, this research memo only considers the 2019 version because that was the version applicable at the time the hearing examiner made his decision.

b) *Hearing Examiner's Conditional Approval*

Willowbrook and Meadow Springs argue the hearing examiner should not have

approved the site plan application because Big Creek did not lay out a stormwater

management plan and has not obtained an NPDES permit for the proposed project.

With regard to the stormwater issues, the hearing examiner entered the following

finding:

> The Staff Report adequately summarizes evidence and information included
> in the record, and proposed conditions of approval to address Stormwater
> issues and requirements that will ensure that no stormwater runoff will drain
> into adjacent wetlands, in accord with state and local stormwater
> requirements. . . . Opposition comments did not include a preponderance of
> evidence to establish that stormwater would drain into a wetland.

AR at 1773.

In addition to the above finding, the hearing examiner conditioned his approval on

the receipt of an NPDES permit, unless Big Creek can demonstrate it meets an exemption

under chapter 16.06 RMC, and compliance with the SWMMEW as well as the City's

stormwater provisions. That portion of the conditional approval provided:

> All construction projects that don't meet the exemption requirements
> outlined in Richland Municipal Code, Section 16.06 shall comply with the
> requirements of the Washington State Department of Ecology issued

Eastern Washington NPDES Phase II Municipal Stormwater Permit.[22]
The Developer shall be responsible for compliance with the permit
conditions. All construction activities subject to this title shall be required
to comply with the standards and requirements set forth in the Stormwater
Management Manual for Eastern Washington (SWMMEW) and prepare a
Stormwater Site Plan. In addition, a Stormwater Pollution Prevention Plan
(SWPPP) or submission of a completed erosivity waiver certification is
required at the time of plan submittal. The City has adopted revised
standards affecting the construction of new stormwater facilities in order to
comply with conditions of its NPDES General Stormwater Permit program.
This project, and each phase thereof, shall comply with the requirements of
the City's stormwater program in place at the time each phase is
engineered. The project will require detailed erosion control plans.

AR at 1790. The following activities are exempt from chapter 16.06 RMC: forest
practices, commercial agriculture, oil and gas field activities or operations, and road and
parking area preservation/maintenance. RMC 16.06.020. As Big Creek's project
proposal does not fit within any of the exempt categories, the hearing examiner's decision
requires Big Creek to obtain an NPDES permit.

---

[22] It appears that the Big Creek would be a "small" operator of Municipal Separate
Storm Sewer Systems (MS4) for the purposes of this project, and thus, stormwater
discharges occurring would potentially require a NPDES Phase II permit. *See* 40 CFR
§ 122.26(b)(15); *Municipal Stormwater Permit Guidance*, DEP'T OF ECOLOGY (last
visited Jan. 9, 2025), https://ecology.wa.gov/regulations-permits/guidance-technical-
assistance/stormwater-permittee-guidance-resources/municipal-stormwater-permit-
guidance; *Small MS4 Stormwater Program Overview (Fact Sheet 2.0)*, U.S. ENV. PROT.
AGENCY (Aug. 2023), https://www.epa.gov/system/files/documents/2023-09/EPA-
Stormwater-Phase-II-Final-Rule-Factsheet-2.0-Small-MS4-Overview.pdf.

The hearing examiner also conditioned the approval on Big Creek preventing

stormwater from draining to areas adjacent to the project site:

> Stormwater shall be kept on-site (on the developing property that generated it). Stormwater shall not be flowed onto adjacent properties, or to the public Right-of-Way, without first obtaining written permission.
>
> . . . .
>
> The amount of post-development storm runoff from the proposed site shall not exceed the amount of pre-development runoff.

AR at 1790-91.

The issue underlying the stormwater arguments from Willowbrook and Meadow

Springs appears to be the scope of the hearing examiner's authority and whether he was

required to ensure Big Creek had a viable stormwater site plan in place or whether he

could approve the application subject to conditions that a proper stormwater management

system be put in place and Big Creek obtaining the requisite permits. As explained

previously, the hearing examiner's authority during the site plan review process is limited

to facilitating "project design that is compatible with adjacent land uses and is in keeping

with the physical constraints of the project site." RMC 23.48.010. And the RMC

provision laying out the requirements for a site plan application makes no mention of

stormwater management systems.[23]  *See* RMC 23.48.030.

In addition, the site plan approval process allows the hearing examiner to approve

an application subject to conditions and requiring stormwater drainage facilities is

specifically listed as a permitted condition: "[s]ite plan approvals may be made subject to

any condition(s) which . . . may include but are not limited to . . . the installation of

---

[23] An applicant must submit the following information to the hearing examiner:

> A. Boundaries and dimensions of the property;
>
> B. Location and width of boundary streets;
>
> C. Dimensions, location and number of dwelling units for each existing or proposed structure on the site;
>
> D. Roadways, walkways, off-street parking, and emergency vehicle access;
>
> E. Fencing and landscaping, showing location, type, dimensions and character; and
>
> F. Location, dimensions and character of recreational facilities and open space.
>
> G. The site plan shall be drawn in a concise and accurate manner, and of an appropriate scale for clarity in review.  Copies shall be submitted in a number determined by the administrative official to be appropriate and sufficient.
>
> H. Where a multiple-family development is proposed to be constructed in phases, the site plan shall include all phases, regardless of size, in the proposed development.  After a site plan providing for phased development has been approved by the hearing examiner, no further approval is required so long as each phase of development conforms to the approved site plan.

RMC 23.48.030.

stormwater drainage facilities." RMC 23.48.040. Far from requiring a completed stormwater management design to be presented during the site plan approval phase, the process contemplates situations where plans for a stormwater system are not a part of the site plan application but will be necessary in the development process. It can be inferred from the provision regarding conditions of approval that, in such situations, rather than requiring that the stormwater management plans be included in the application, the hearing examiner may condition approval of the site plan application on compliance with applicable stormwater management provisions.

This is exactly what the hearing examiner did here. He approved Big Creek's application, but conditioned his approval on Big Creek complying with the applicable stormwater provisions, including requiring that the development not result in an increase in stormwater runoff and Big Creek obtain the necessary permits under the CWA. Because the hearing examiner complied with the requirements of the site plan review process, his decision was not an erroneous interpretation of the law and did not clearly erroneously apply the law to the facts.

Meadow Springs also argues that the hearing examiner erred in approving the site plan application because Big Creek had not received the required NPDES permits under

the CWA.[24]  However, the hearing examiner did include in the conditions of approval a requirement that Big Creek obtain an Eastern Washington NPDES Phase II Municipal Stormwater Permit and otherwise comply with the requirements of the Department of Ecology's SWMMEW.  As explained above, the SWMMEW lays out guidelines for compliance with the CWA, and the Department of Ecology has stated that compliance with the SWMMEW "should result in compliance with existing regulatory requirements for stormwater, including compliance with the federal Clean Water Act."  SWMMEW, *supra*, at 44.  Meadow Springs does not dispute this statement from the Department of Ecology or explain how the hearing examiner's requirement that Big Creek obtained an NPDES permit and comply with the SWMMEW will not ensure that Big Creek complies with the CWA.

---

[24] Although addressing this claim is not required for resolution of Meadow Springs' argument, Meadow Springs contends that Big Creek is required to obtain permits under both §§ 402 and 404.  Section 402 permits (also known as NPDES permits) are required for discharge of pollutants into the navigable waters of the United States. 33 U.S.C. § 1342(a)(4); *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 247 (D.C. Cir. 2014).  Permits are required under § 404 for "discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  The hearing examiner conditioned his approval on Big Creek obtaining the requisite NPDES permit. Moreover, Meadow Springs fails to explain, and it is not evident from the record, how the project would involve dredging or filling into navigable waters in such a way that would require a § 404 permit.

An applicant is not required to include a stormwater management plan in a site plan approval application, and the hearing examiner properly conditioned approval of the site plan application on the installation of stormwater drainage facilities and obtaining requisite NPDES permits. Therefore, the hearing examiner did not erroneously interpret the law or erroneously apply the law to the facts.

### 8. *Migratory Bird Treaty Act*

Meadow Springs argues that the proposed development will result in the unlawful taking of birds under the "Migratory Bird Treaty Act [of 1918 (MBTA),] (16 U.S.C. Section 703[-12])" because it will harm the habitat of birds protected under the MBTA, resulting in indirect harm to the birds. Meadow Springs fails to show a violation of the MBTA.

Meadow Springs fails to articulate which prong of RCW 36.70C.130(1) that it is claiming to be entitled to relief under. However, it appears Meadow Springs is contending that the hearing examiner's decision was a clearly erroneous application of the law to the facts. RCW 36.70C.130(1)(b), (d). A "clearly erroneous" determination under subsection (d) requires this court to apply the law to facts to "determine whether we are left with a definite and firm conviction that a mistake has been committed," while deferring to the hearing examiner's factual determinations. *Cingular Wireless*, 131 Wn. App. at 768.

Except where permitted by a valid permit, the MBTA makes it a crime to "pursue, hunt, take, capture, kill . . . any migratory bird, any part, nest, or egg of any such bird . . . included in" certain treaties adopted for the protection of migratory birds.  16 U.S.C. § 703(a).  The regulations define "take" as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect."  50 C.F.R. § 10.12.

The MBTA is limited in scope and generally does not apply to indirect "takings." "[O]n its face, the Migratory Bird Treaty Act does not appear to extend to agency action that only potentially and indirectly could result in the taking of migratory birds." *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 117 (D.C. 2014).  Although habitat destruction may cause harm to migratory birds, it does not result in a taking under the MBTA.  *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991).

Here, Meadow Springs appears to be alleging that the project will destroy the habitat of several migratory birds and therefore the development will result in an illegal taking under the MBTA.  However, as explained above, "taking," for the purposes of the MBTA, does not include habitat destruction that indirectly causes harm to migratory birds.

Because the only "taking" alleged is a taking incidental to habitat destruction, the MBTA does not apply.  Therefore, because Meadow Springs has failed to show a

violation of the MBTA, the hearing examiner's decision was not a clearly erroneous application of the law to the facts.

### 9. *Endangered Species Act*

Meadow Springs argues the hearing examiner's decision violated the ESA. Meadow Springs does not state the basis for the alleged violation, nor does it cite to a specific provision of the ESA that it claims the hearing examiner's decision violated. Instead, Meadow Springs notes that Amon Creek contains Spring Chinook salmon and asserts it would have standing to bring a claim under the ESA.[25] The entire argument on Meadow Springs' ESA claim spans two pages and fails to provide analysis of the relief it requests. We decline to consider this argument. *See* RAP 10.3(a); *Regan*, 163 Wn. App. at 177-78;

### 10. *Findings on Public Health, Safety, and Welfare*

Meadow Springs argues the hearing examiner failed to adequately articulate how the City had fulfilled its obligation to protect the public health and welfare of its citizens. Meadow Springs does not assign error to any particular finding of fact or conclusion of law. Br. of Appellant (Meadow Springs) at 9 (Assignment of Error 2). Instead, Meadow

---

[25] Meadow Springs also, in passing, mentions that the City has obligations under the "Treaties of 1855 between the United States and the Indian Tribes of Washington, to protect the right of the Tribes and their members." Br. of Appellant (Meadow Springs) at 18. But Meadow Spring does not support or explain this assertion. Therefore, we decline to address it.

Springs contends that the hearing examiner's decision failed to make necessary findings or address environmental issues raised by the petitioners. Br. of Appellant (Meadow Springs) at 23-24.

Meadow Springs fails to identify which of the statutory grounds applies to this alleged error. We presume that Meadow Springs is claiming that the decision's failure to address the environmental issues is based on an "erroneous interpretation of the law," and a "clearly erroneous application of the law to the facts." RCW 36.70C.130(1)(b), (d).

As explained above, we review interpretations of the law de novo and application of the law for clear error. Under the "clearly erroneous standard" a court applies the law to the facts to determine whether it is "left with a definite and firm conviction that a mistake has been committed," while deferring to the hearing examiner's factual determinations. *Cingular Wireless*, 131 Wn. App. at 768.

The hearing examiner's authority was limited to "facilitat[ing] project design that [was] compatible with adjacent land uses and [was] in keeping with the physical constraints of the project site." RMC 23.48.010. "The site plan review is not intended to determine whether a particular land use activity is appropriate on a particular site." RMC 23.48.010. Nothing in chapter 23.48 RMC, which governs the site plan review process, required the hearing examiner to make findings related to the environmental impacts of a proposed project or the project's impact on public health and welfare of the citizens.

58

Nevertheless, the hearing examiner did find that the site plan, as conditioned, made "adequate provision for the public health, safety, and welfare, and [would] be in the best interest of the citizens of the city." AR at 1781. Although the hearing examiner did not specifically articulate how the evidence supported his finding, the finding was supported by much of the evidence presented below including the City's SEPA DNS, which determined that the project would not have a significant environmental impact, traffic impact studies demonstrating that the increase in traffic would not be above accepted levels, and the fact that no stormwater would drain into the adjacent Amon Creek Natural Preserve. Thus, the hearing examiner's finding related to the project's impact on the public health and welfare was supported by substantial evidence.

Meadow Springs also contends the hearing examiner was required to consider the public's comments and address issues related to the proposal's compliance with "the City's comprehensive land use plan, zoning code, and other laws and policies . . . including those intended to protect the community's quality of life, the area's natural resources, the public health, safety, and welfare, and the public interest." Br. of Appellant (Meadow Springs) at 26. The nature of this alleged error is unclear. To the extent it is alleging that the hearing examiner failed to consider public comment, the hearing examiner did invite comment from the public prior to, during, and following the site plan review hearing and his decision reflected that he thoughtfully considered these comments in making his decision. *See, e.g.*, AR 1769 (addressing zoning and land use

issues raised in public comments); AR 1770 (stating that opposition comments focused on fact that apartments might be constructed on project site); AR 1771 (finding staff report credibly summarized SEPA comments for the project and noting there were comments and concerns about potential fish and wildlife); AR 1773 (referring to opposition comments related to stormwater issues).

The hearing examiner was not required to make a finding regarding whether the project would have an impact on public health and welfare. Nevertheless, the hearing examiner did make such a finding, and the finding was supported by substantial evidence.

CONCLUSION

We reverse and remand for the hearing examiner to determine whether additional evidence is needed in order to make adequate findings and conclusions on (1) whether the proposed non-residential driveway and retention pond are allowable uses on property zoned R-1-10, (2) whether the non-residential driveway was subject to the standards set forth in chapter 12.04 RMC, and if so, whether the proposed driveway conformed to those standards, and (3) determine, based on reliable evidence, the proper classification of the Amon Creek Natural Preserve. On all other issues, we deny relief.

No. 39628-2-III
*Miller, et al v. City of Richland, et al*


Affirmed in part, reversed in part, and remanded.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Cooney, J.

61